**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:25-cr-157** |
| | : | |
| v. | : | **Judge Algenon L. Marbley** |
| | : | |
| LARRY ALFONSO ROWE, | : | |
| | : | |
| **Defendant.** | : | |

**OPINION & ORDER**

This matter comes before this Court on Defendant Larry Alfonso Rowe's Motion to Suppress statements he made and evidence obtained by the police from his car during a traffic stop on August 14, 2025. (ECF No. 30 at 1–2). Rowe argues that the police violated his rights under the Fourth and Fifth Amendments to the United States Constitution because the traffic stop and vehicle search, along with his detention, arrest, and custodial interrogation, were unlawful.

The police had probable cause to stop and detain Rowe, arrest him, and search his car. Therefore, the firearm and narcotics that police found in his car are not suppressed. But when Rowe was in custody, one officer impermissibly questioned him before advising him of his rights. Rowe was entitled to that admonition, and therefore, some of his statements must be suppressed. His Motion to Suppress is **DENIED** in part and **GRANTED** in part.

## I.  BACKGROUND

Larry Alfonso Rowe was targeted for investigation by the Columbus Division of Police in the summer of 2025. Detectives believed Rowe was dealing drugs, so they wanted to search him for contraband. They organized surveillance by two patrol officers—Michael Church and David Feltner—and tracked Rowe's location so that the patrol officers could follow him and stop him if

1

he committed a traffic violation. Just before noon on August 14, 2025, Church and Feltner observed Rowe speeding in a car with heavily tinted windows. They pursued him, activated their siren, and Rowe promptly pulled over. (ECF Nos. 30 at 2; 31 at 1–2). Body-worn cameras on the officers[1] and a dash camera in the police cruiser captured the stop.

Officer Church approached Rowe at the driver side of the car and engaged with Rowe, who rolled his window down. Officer Feltner arrived at the passenger side of the car and attempted to look in through the tinted windows. The officers asked Rowe to roll down the rest of his windows due to their tint and ordered him to show his license, registration, and proof of insurance. Rowe quickly complied. Then, the officers told Rowe he seemed nervous and ordered him to get out of the car. They patted him down for weapons and commented that they could smell a strong odor of marijuana. Rowe was directed away from his car and toward the police cruiser. (Gov't Ex. 1 & Def. Ex. D at 2:15–4:05).

Rowe expressed confusion, and Church told him to "hang out" in the back of the cruiser due to his nerves. Rowe protested and Church relented, telling him he could wait by the front bumper of the cruiser if he preferred. Rowe walked back to the front of the cruiser, and Officer Feltner began questioning Rowe about the smell of marijuana. By this point, Rowe had become increasingly vocal in making inquiries about his detention, so Church signaled Feltner and the officers moved in unison to restrain him. They quickly patted Rowe down again before placing him in handcuffs. (Gov't Ex. 1 & Def. Ex. D at 4:05–6:29).

Despite Rowe's protests, the police placed him in the back of their cruiser, and began to search his car. Church promptly discovered bottles of promethazine and a baby bottle filled with

---

[1] Officer Church's body-worn camera video was entered into evidence as Government's Exhibit 1, and Officer Feltner's body-worn camera video was entered into evidence as Defendant's Exhibit D. (*See* ECF No. 43 at 1).

green liquid in an open black backpack, which was sitting on the floor of the front passenger side of the car. A search of a closed compartment in that same bag yielded a large quantity of pills and a loaded Glock pistol. (Gov't Ex. 1 at 7:16–8:25). Church called the detectives, informed them that they "made the right call" in targeting Rowe, and explained that Rowe was handcuffed in the back of the police cruiser and that he and Feltner were searching Rowe's car. (*Id.* at 8:25–9:21).

The search continued for some time, and the police found a marijuana roach inside an ashtray cup in the center console after removing its lid. (*See id.* at 9:21–17:24). Feltner tested the tint of Rowe's driver side window and determined it was too great, with a light transmittance of only 15%. (Def. Ex. D at 17:48–18:10). Church then returned to the cruiser and informed Rowe that he would be read his rights. Before Church actually read Rowe his rights, however, he continued to ask Rowe incriminating questions related to the traffic stop—for instance, asking Rowe if he had been drinking. (Gov't Ex. 1 at 18:50–18:54). They also discussed what would happen to Rowe's property, and then Church took another call, prepared paperwork, and explained to Rowe why he was pulled over. (*Id.* at 17:24–24:50). Seven minutes after telling Rowe he would read him his rights, Church finally read Rowe his rights. Rowe confirmed he understood them, and after being *Mirandized*, confirmed that the items in his car were his, and claimed that the pills were Adderall that "got [his] heart racing" during the traffic stop. (*Id.* at 24:50–27:01). Rowe received a citation for the window tint and was permitted to leave, less one Glock pistol and backpack filled with drugs. (ECF No. 31 at 3).

On August 19, 2025, the Government charged Rowe with one count for possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (ECF No. 14 at 1). Rowe's trial was scheduled for February 23, 2026. On January 12, 2026, he filed the instant Motion, seeking to suppress evidence and statements obtained from that traffic stop. (ECF No. 30). The Government

3

opposed, and this Court held an evidentiary hearing on February 10, 2026, where Church testified and videos from the body-worn cameras of Church and Feltner were admitted into evidence.

## II.  STANDARD OF REVIEW

The Fourth and Fifth Amendments to the United States Constitution provide foundational protections against Government overreach by safeguarding individuals and their property from unreasonable searches and seizures and ensuring that individuals are not forced to speak against their own interests in criminal cases.

### A.  Fourth Amendment

The Fourth Amendment protects against unreasonable searches and seizures.  It provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. IV.  To comply with it, law enforcement generally must obtain a warrant, supported by probable cause and from a "neutral and detached" judicial officer, before searching people, homes, or property for evidence of criminal wrongdoing. *Riley v. California*, 573 U.S. 373, 382 (2014) (citation and internal quotation marks omitted); *see Kentucky v. King*, 563 U.S. 452, 459–60 (2011).  These requirements "guarantee[] the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 613–14 (1989).  When law enforcement violates these requirements, "courts generally suppress the resulting evidence." *United States v. Bateman*, 945 F.3d 997, 1005 (6th Cir. 2019). Warrantless searches and seizures are presumptively unreasonable, but there are several exceptions to the warrant requirement. *King*, 563 U.S. at 459.  One such exception permits law enforcement to search vehicles—and containers inside them—given that vehicles otherwise could "be quickly

4

moved out of the locality or jurisdiction in which the warrant must be sought." *California v. Acevedo*, 500 U.S. 565, 569, 572 (1991) (citation and internal quotation marks omitted).

### B. Fifth Amendment

The Fifth Amendment protects against self-incrimination to the targets of Government investigations. It guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. The "core protection" of this self-incrimination clause "is a prohibition on compelling a criminal defendant to testify against himself at trial." *United States v. Patane*, 542 U.S. 630, 637 (2004) (plurality opinion). But because "the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated," the Supreme Court created a presumption of coercion absent specific warnings. *Id.* at 639. These warnings, which are "absolute prerequisite[s] to interrogation," inform the suspect that he has the right to remain silent, that anything he says can and will be used against him in court, that he has a right to consult with an attorney, and that an attorney will be appointed to represent him if he cannot afford one. *Miranda v. Arizona*, 384 U.S. 436, 444–45, 467–73 (1966). When an officer fails to inform a suspect of his *Miranda* rights, the suspect's unwarned statements may not be admitted at trial. *United States v. Burton*, 828 F. App'x 290, 292 (6th Cir. 2020) (citing *Miranda*, 384 U.S. at 492).

### III.  LAW & ANALYSIS

Rowe's Motion to Suppress challenges all aspects of his August 14, 2025 encounter with law enforcement:  (a) the traffic stop; (b) his detention, the expanded scope of the stop, and the warrantless search of his vehicle; (c) his pre-*Miranda* statements; and (d) the police action that yielded physical evidence and his statements. He bears the initial burden of proof under the Fourth Amendment, *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003), which

5

encompasses both "production and persuasion." *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014). If he satisfies this burden, the Government must "demonstrate[e] an exception to the warrant requirement." *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019). Rowe also bears the burden of proof under the Fifth Amendment. He must show that he was "subjected to a custodial interrogation, and thus entitled to *Miranda* warnings in the first place," and if he does, the burden shifts to the Government to show a knowing and voluntary waiver. *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 878–79 (S.D. Ohio 2016) (Marbley, J.).

Rowe's Fourth Amendment Motion to Suppress is denied in its entirety because Officers Church and Feltner had probable cause to initiate the traffic stop based on Rowe's speed and tinted windows; detained Rowe incidental to the traffic stop and had probable cause to search his car due to the odor of marijuana; and therefore the evidence obtained from his car is not fruit of the poisonous tree. However, Rowe's Fifth Amendment Motion to Suppress is denied in only part. The police asked Rowe several questions after he was handcuffed and in custody but before he had been advised of his *Miranda* rights, and Rowe's responses to those questions must be suppressed.

### A. The Traffic Stop

Ordinary traffic stops are seizures for Fourth Amendment purposes. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Thus, evidence seized during illegal traffic stops "must be suppressed as fruits of the poisonous tree." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citation and internal quotation marks omitted); *see Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). Police may lawfully stop a car when they have probable cause to believe that a crime is happening, or a civil traffic violation has occurred. *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012). The infraction need not be severe, *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008); *accord United States v. Stevenson*, 43 F.4th 641, 645 (6th Cir. 2022) (citing *Blair*, 524 F.3d at 748), and the

6

probable cause requirement is not a high bar. Probable cause exists where there are "facts and circumstances" sufficient that a "prudent person" would be warranted to believe that a "suspect has committed, is committing, or is about to commit an offense." *Stevenson*, 43 F.4th at 645 (citations and internal quotation marks omitted). It is a "practical and common-sense standard based on the totality of the circumstances," and allows for "certain reasonable mistakes." *Id.* (citations and internal quotation marks omitted).

Rowe challenges the traffic stop, arguing that Officers Church and Feltner lacked probable cause or reasonable suspicion to stop him. He points out that they wanted to stop him and search his car before seeing him commit any traffic violation, and notes that the police were tracking his car[2] before the stop. (ECF No. 30 at 2–6). It follows that the window tint and speeding violations were fabricated and pretextual reasons for his traffic stop. (*Id.* at 5–6). The Government counters that Officers Church and Feltner had probable cause to initiate the traffic stop because they believed Rowe was committing two distinct traffic violations: speeding and driving a car with impermissibly tinted windows. (ECF No. 31 at 4–5). The Government also points out that subjective police motives are irrelevant where there is probable cause to effectuate a traffic stop. (*Id.* at 6).

---

[2] Rowe does not actually argue that the tracking of his vehicle was itself unlawful. (*See* ECF No. 30 at 2, 4–6). Although police tracking of a vehicle can constitute a search for Fourth Amendment purposes, *see United States v. Jones*, 565 U.S. 400, 404–05 (2012); *accord Carpenter v. United States*, 585 U.S. 296, 309–10 (2018), Rowe has not actually developed an argument here that the police tracking constituted a search. Thus, to the extent he suggests that the tracking of his vehicle was unconstitutional, that argument is waived. *SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 952 n.29 (S.D. Ohio 2009) (Marbley, J.) (conclusory and underdeveloped arguments made without citation to legal authority are waived); *United States v. Layne*, 192 F.3d 556, 566–67 (6th Cir. 1999); *accord Alston v. City of Detroit Police Officers*, 717 F. Supp. 3d 618, 628–29 (E.D. Mich. 2024).

The Government is correct; the traffic stop was lawful. It is undisputed that Officers Church and Feltner observed Rowe speeding in a car with very dark windows.[3] Either observation alone would provide them with probable cause to conduct a traffic stop, and their subjective intent in effectuating such a stop is irrelevant to the stop's legality: The Fourth Amendment "allows 'police officers to stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop.'" *United States v. Warfield*, 727 F. App'x 182, 188 (6th Cir. 2018) (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)). Any pretext on the part of the police does not invalidate the stop. *Id.* at 188; *Blair*, 524 F.3d at 748; *see also, e.g.*, *United States v. Tillman*, 543 F. App'x 557, 560 (6th Cir. 2013) (arguments that a traffic stop was pretextual based on race raised equal protection concerns, not search and seizure concerns, because subjective motivations are irrelevant to the validity of searches and seizures). Officers Church and Feltner had probable cause to stop Rowe based on speed and window tint.

### B. Rowe's Detention, Scope of the Stop, and Vehicle Search

Next, Rowe challenges his detention, the expansion of the scope of the traffic stop, and the subsequent search of his car. He argues that his detention and the traffic stop's expansion lacked any justification, and contrary to the Government's narrative of his aggression and nervousness, he claims that he was nothing but calm, polite, and compliant. (ECF No. 30 at 6). Moreover, he asserts that the "alleged odor of burnt marijuana" was, along with the mischaracterization of his behavior, nothing more than a ruse for the police to search the vehicle. (*Id.* at 6–7). Rowe posits that any

---

[3] Ohio law requires cars have a "light transmittance" of at least 50% in the front passenger and driver side windows. Ohio Admin. Code § 4501-41-03(A)(3); *see* Ohio Rev. Code § 4513.241(C). When Officer Feltner tested the driver side window of Rowe's car, it registered a light transmittance of only 15%.

8

warrantless search of his vehicle would require the odor of "fresh burnt marijuana," but his vehicle was "not emanating an odor of freshly burnt marijuana." (*Id.* at 7–8). Last, he argues that the burned marijuana roach found within the ashtray cup was not in plain view and could not provide the police with probable cause to conduct a search.

The Government asserts that the warrantless search of Rowe's vehicle after his stop was lawful, and probable cause existed for three reasons: the odor of marijuana, marijuana in plain view, and Rowe's erratic behavior. (ECF No. 31 at 7–10). The Government cites older Sixth Circuit cases and argues that smelling marijuana alone provides probable cause for a vehicle search, as does seeing marijuana in plain sight. (*Id.* at 8 (citing, *inter alia*, *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993) (smelling marijuana provided probable cause); *Carter v. Parris*, 910 F.3d 835, 839 (6th Cir. 2018) (seeing small quantity of marijuana provided probable cause in Tennessee)). In the alternative, the Government argues that if the smell and sight of marijuana alone was not enough, the totality of the circumstances provided probable cause. Under this totality of the circumstances theory, the smell of marijuana, coupled with Rowe's "odd" behavior and "nervousness" provided probable cause. (*Id.* at 9). The Government's argument and Officer Church's testimony characterized Rowe's movements within the car, including his quick opening and closing of the glove compartment, as "aggressive[]," and observed that during the first pat-down Rowe had apparently urinated on himself. (*Id.* at 1–2, 9–10). Coupled with Rowe's general nervousness, they say his behavior combined with the presence of marijuana provided an alternative basis to search the vehicle.

It is undisputed that Rowe was speeding with impermissibly dark windows; Officers Church and Feltner had probable cause to stop him for these reasons. *Stevenson*, 43 F.4th at 645, 647; *see* Section III(A), *supra*. In light of these facts, several relevant principles inform this Court's analysis

as to whether the police properly detained Rowe, expanded the scope of the stop, and searched the car. First, the police were "authorized" to ask Rowe to step out of his vehicle and to detain him "in the course of an otherwise lawful traffic stop," because "the Fourth Amendment permits officers to conduct an otherwise legitimate stop on their own terms." *United States v. Turk*, 744 F. Supp. 3d 794, 803 (E.D. Mich. 2024). The first pat-down was unproblematic, as the body-worn camera evidence indicates that Rowe's consent was voluntarily given, and a request "for consent to frisk . . . come[s] within the settled boundaries of what officers may do during a stop." *United States v. Daniel-Dejesus Santos*, 161 F.4th 1007, 1011 (6th Cir. 2025). Finally, there is no doubt that "newly discovered information" obtained during a traffic stop can allow further detention to investigate other crimes. *Stevenson*, 43 F.4th at 648. Police "may search a car without a warrant if they have probable cause to believe it contains evidence of criminality." *United States v. Saine*, 162 F.4th 804, 807 (6th Cir. 2025). The central question here is whether the police had probable cause.

***Odor of marijuana.*** There is a fresh wrinkle to the law of probable cause for vehicle searches based on the smell of marijuana in Ohio. It had been well-established that the smell of marijuana "as detected by a person who is qualified to recognize the odor" alone was "sufficient to establish probable cause" when marijuana was illegal in Ohio. *State v. Moore*, 734 N.E.2d 804, 807–08 (Ohio 2000) (recognizing that this approach was shared with federal courts). Now, Ohio has legalized marijuana for recreational use, and its courts are divided as to the staying power of *Moore*, and whether the odor of marijuana still provides probable cause for vehicle searches. *Compare State v. Myers*, 2025-Ohio-1169, ¶¶ 32, 34 (4th Dist. 2025) (marijuana odor alone provides sufficient probable cause), *and State v. Smith*, 2025-Ohio-5752, ¶¶ 54–56 (4th Dist. 2025) (similar), *with State v. Gray*, 2025-Ohio-4607, ¶¶ 1–2 (1st Dist. 2025) (the "smell of marijuana alone" cannot establish probable cause), *and State v. Waters*, 2025-Ohio-4479, ¶¶ 1–2 (1st Dist. 2025) (marijuana

10

odor plus driver's admission to smoking can provide probable cause); *see also State v. Brefford*, 2025-Ohio-4436, ¶¶ 36–37 (10th Dist. 2025) (questioning the continuing viability of *Moore* but declining to address it).  Though there is no doubt that "the Fourth Amendment permits officers to smell while they issue traffic tickets," *Stevenson*, 43 F.4th at 648, the Government's legal authority from *Garza* and *Carter* establishing probable cause from the odor or sight of marijuana predates Ohio's legalization of recreational marijuana and partially relies on Tennessee law, where marijuana remains illegal at the state level.  *See Saine*, 162 F.4th at 808.  Now that marijuana is legal for recreational use in Ohio, does the smell of marijuana alone provide probable cause for a vehicle search?

The answer is that it does.  The smell of marijuana alone still provides probable cause for a vehicle search as a matter of federal law.  Recent Sixth Circuit caselaw is instructive:  the smell of marijuana "provides probable cause to search a car" because it "could lead a reasonable person to believe that the drug will be found in the car." *United States v. Santiago*, 139 F.4th 570, 574 (6th Cir. 2025) (citation and internal quotation marks omitted); *see United States v. Harris*, 2025 WL 3689136, at *3 (6th Cir. Dec. 19, 2025) (same).  Although these cases originate from police searches in Tennessee, where marijuana remains illegal at the state level, the probable cause analysis remains unchanged by the fact that the recreational use of marijuana is now legal at the state level in Ohio. Under Ohio law, it remains illegal to use or consume cannabis while in a car.  Ohio Rev. Code § 3780.36(D)(1) (violation of Ohio law to operate a car "while using . . . cannabis or while under the influence of . . . cannabis"); *id.* § 3780.36(D)(2) (violation of Ohio law to simply smoke cannabis "while in" a car)[4]; *see id.* §§ 4511.19(A)(1)(a), (A)(1)(j)(vii)–(viii), (G)(1)(a) (the first

---

[4] Ohio Rev. Code § 3780.36 is repealed effective March 20, 2026.  *See* S.B. 56, 136th Gen. Assemb. (Ohio 2025).

violation is a first-degree misdemeanor and may carry jail time). Thus, the odor of marijuana in the car gave Officers Church and Feltner probable cause to search the vehicle by itself.[5]

Whatever nuanced distinction Rowe seeks to parse between "fresh burnt marijuana" and other, less-freshly burned marijuana is a distinction without a difference for the purposes of probable cause. Ohio law still restricts the use of marijuana in vehicles even though recreational marijuana is legalized, and thus the smell of marijuana alone can provide probable cause because its use in vehicles is still restricted. *See United States v. Jackson*, 103 F.4th 483, 486–90 (7th Cir. 2024) (smell of burned marijuana alone provided probable cause to search defendant and car even though Illinois had legalized recreational marijuana); *accord United States v. McNair*, 2025 WL 2682683, at *2–3 (6th Cir. Sept. 19, 2025) (smell of marijuana provided probable cause to search a vehicle even though hemp is legal federally and Florida legalized medical marijuana); *cf. Saine*, 162 F.4th at 808 (observing that "human officers smelling marijuana can provide probable cause for an arrest, even when certain types of cannabis are legal"). Officers Church and Feltner smelled marijuana near Rowe's car while conducting the traffic stop and were "justified . . . in believing that marijuana [was] present." *Santiago*, 139 F.4th at 574. Rowe could violate Ohio law by using marijuana in his car, and the police would have probable cause to arrest for a marijuana-related crime if they had reason to believe that type of crime was occurring or had occurred. *Cf. id.*

Thus, Officers Church and Feltner "did not unreasonably extend the duration of the stop." *Turk*, 744 F. Supp. 3d at 802–03. They had developed probable cause that further criminal activity was occurring due to the odor of marijuana. Specifically, the odor of marijuana suggested that they might find evidence that Rowe had been smoking marijuana while in or operating his car, in

---

[5] To the extent that some recent Ohio state court cases suggest the opposite, they not control. Federal courts do not defer to state courts "on what constitutes probable cause under the Fourth Amendment." *United States v. Jackson*, 103 F.4th 483, 490 (7th Cir. 2024).

violation of state law. *See Santiago*, 139 F.4th at 574; *e.g.*, *Jackson*, 103 F.4th at 486–90; *McNair*, 2025 WL 2682683, at *2–3; *accord United States v. Outlaw*, 138 F.4th 725, 729 (3d Cir. 2025) ("[T]he smell of marijuana alone can create probable cause to search a vehicle."). Thus, Rowe's continued detention, the expanded scope of the stop, and the vehicle search were all lawful based on the odor of marijuana.

The Government also advances two alternative probable cause arguments, but neither is convincing.

***Visible marijuana.*** First, the Government argues that the police had probable cause to search the car due to the presence of a marijuana roach in the ashtray in Rowe's car. The Government takes the position that this all was "in plain sight." (ECF No. 31 at 8). This Court does not understand why. As Rowe points out, the roach was *inside* the ashtray and under the ashtray's lid—the lid only contained some ash or burned residue. (*See* Gov't Ex. 1 at 16:06–16:19; Def. Ex. D at 2:40). Though the ash and burned residue was visible from the outside the car, the roach itself was not visible at all unless the ashtray was opened. From "the vantage point of an individual looking through the passenger [or driver] side window from outside the vehicle, the [marijuana roach] was not in plain view." *United States v. Loines*, 56 F.4th 1099, 1108 (6th Cir. 2023). Thus, Officers Church and Feltner could not have probable cause to search the vehicle based on seeing the marijuana roach because they simply could not have seen it until they searched the vehicle.

***Behavior.*** Next, the Government asserts that Rowe's behavior supported probable cause, particularly when coupled with the smell and sight of marijuana. Officer Church testified that Rowe's behavior was nervous and aggressive by the way he opened the glove compartment, moved around in the car, and handed documents to the police. But Officer Church's read of the entire situation is dubious. Church testified that he believed that Rowe was about to fight or flee before

he was physically restrained. Although Rowe is a big man, he is not in the same physical universe as Church and Feltner: either police officer might have been mistaken as Arnold Schwarzenegger's long-lost cousin. By comparison, Rowe appeared to be noticeably out of shape. The notion that he would attempt to outrun or outgun both officers strains credulity, and Officer Church's testimony on this point was, at best, hyperbolic.

Moreover, the Government's behavior argument is flatly contradicted by video evidence. The body-worn videos show that Rowe was calm and courteous when the police first approached his car and remained compliant throughout his interaction with the police—even if he grew increasingly frustrated. The movements that the Government points to as "aggressive" show nothing other than Rowe's immediate compliance with police orders. His nervousness, fidgeting, and apparent discomfort throughout the traffic stop cannot be unexpected: many people "become nervous during a traffic stop, even when they have nothing to hide or fear." *United States v. Richardson*, 385 F.3d 625, 630–31 (6th Cir. 2004); *see United States v. Noble*, 762 F.3d 509, 522–23 (6th Cir. 2014) (collecting cases). The tenor and quick escalation of the stop matter a great deal in explaining Rowe's behavior. Almost immediately after being stopped, Rowe was ordered out of his car, directed to the back of a police cruiser, patted down twice, handcuffed, and secured in the back of a police cruiser. His anxious but willing compliance with police commands does not appear to be anything other than the reaction that most people would have in his situation. It certainly is not enough to establish probable cause alone. *See United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012) ("Although evasive behavior and nervousness may be considered as part of the probable cause analysis, nervousness alone is insufficient to establish probable cause."). The odor of marijuana was sufficient for probable cause by itself. Nothing about Rowe's behavior would detract from probable cause in a totality of the circumstances analysis, but nothing about his behavior seems

14

to support probable cause either. Ultimately, this Court need not decide probable cause based on a totality of the circumstances, because probable cause is firmly established based on the odor of marijuana.

In short, the marijuana roach was not within the plain view of the police officers and could not support probable cause for a search of Rowe's vehicle. And the evidence is clear that the police did not have probable cause to search Rowe's vehicle based on his behavior alone. Ultimately, the insufficiency of these alternative probable cause theories does not change the outcome.

### C. Rowe's Pre-*Miranda* Statements

Aside from seeking suppression of physical evidence under the Fourth Amendment, Rowe also seeks to suppress the use of his statements under the Fifth Amendment. Law enforcement must provide a *Miranda* warning before conducting a custodial interrogation. But not all forms of police questioning take place when a suspect is "'in custody' for purposes of *Miranda*." *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017). Courts review the "objective circumstances" of the questioning to determine "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.* (quoting *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009)). If, "under the totality of the circumstances, the interviewee's freedom of movement was restrained to a degree associated with formal arrest," then he was in custody for the purposes of *Miranda*. *Id.* Four factors "guide" this determination: (1) the interview's location; (2) the length and manner of questioning; (3) restraints, if any, on the individual's freedom of movement; and (4) whether the individual was told that he needed to answer the questions. *Id.* Other relevant factors include the purpose of the questioning and other "indicia" of custody, such as whether the individual "initiated contact with the police or acquiesced to their requests to answer questions." *Pacheco-Alvarez*, 227 F. Supp. 3d at 881–82.

Rowe argues that his statements were made absent a knowing and voluntary waiver of his *Miranda* rights. Although he points out that determining whether questioning is a custodial interrogation requiring *Miranda* warnings "demands a fact-specific inquiry," he does not advance any particular factual argument, (*see* ECF No. 30 at 3, 9–10), instead asserting at the evidentiary hearing that he was in custody for the purposes of *Miranda* when he was placed in handcuffs.[6]

The Government seems tacitly to agree with the broad strokes of Rowe's conclusion, only arguing that Rowe was not in custody for the purposes of *Miranda* prior to being placed in handcuffs because he was detained subject to a routine traffic stop. The Government's position differs in how it characterizes the pre-*Miranda* custodial questioning. According to the Government, Rowe merely answered "a number of basic questions" incidental to on-the-scene questioning, and was not subjected to "interrogation" for the purposes of *Miranda*. In the alternative, the Government argues that the officers proceeded in good faith, and suppression would not address misbehavior or objectively unreasonable conduct. (*Id.* at 11).

First, it is clear that Rowe was not in custody for the purposes of *Miranda* at the beginning of the traffic stop. Officer Church began questioning Rowe while he was parked on a public street in broad daylight and in view of passersby. They spoke for a few minutes, and Officer Church's questioning was polite. Rowe was never told that he must answer Officer Church's questions, and in fact, he volunteered additional information rather than simply answering the questions as asked. Moreover, Rowe was not physically restrained initially. True, he was ordered to exit the vehicle, but he was not handcuffed upon exiting, and he voluntarily acquiesced to a pat-down. Officer Feltner asked Rowe if he was under the influence of marijuana and commented about the marijuana

---

[6] This occurs at approximately minute 5:40 in both the Government's Exhibit 1 and Defendant's Exhibit D.

smell in the car, and Rowe denied having smoked marijuana. Up to this point, Rowe was merely detained, and *Miranda*'s protections did not apply due to the noncoercive aspect of ordinary traffic stops. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

The custodial nature of the stop started to change when Officer Church asked Rowe to "hang out" in the back of the cruiser. The police then patted Rowe down a second time, handcuffed him, and placed him in the back of their cruiser. (*See* Gov't Ex. 1 at 5:40–6:46).

When the police physically handcuffed Rowe, he was in custody for the purpose of *Miranda*: his freedom of movement was restrained, and he was no longer free to leave. *See United States v. Cook*, 767 F. Supp. 3d 663, 676–77 (N.D. Ohio 2025) (finding *Miranda* applied where individual was "physically detained in handcuffs"); *Pacheco-Alvarez*, 227 F. Supp. 3d 863, 882–83 (noting that location factor can be transformed from a public place when the individual is "confined . . . to the back of a sheriff's cruiser"). This aligns with Officer Church's testimony that he began the second pat-down to gain control over Rowe and take him into custody. Under these circumstances, Rowe's statements made after he was handcuffed but before he was advised of his *Miranda* rights must be suppressed as a general matter. (*See* Gov't Ex. 1 at 5:40–24:50). There are some exceptions here, as the police were permitted to request and obtain limited information from Rowe to complete their administrative tasks, just as they could make "limited and focused inquiries necessarily 'attendant to' . . . legitimate police procedure[s]." *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02, 604–05 (1990) (citation omitted). Thus, some of Officer Church's questions were fine—indeed, some were raised so that he could advise Rowe of his *Miranda* rights. Church asked other questions, however, that could incriminate Rowe, and thus suppression of those statements is warranted.

### D. Fruit of the Poisonous Tree

Rowe also argues that all the evidence recovered from the traffic stop and all his statements resulted from unconstitutional, outrageous, or egregious police action, and must be suppressed. (ECF No. 30 at 10–11). Courts must suppress evidence that is tainted by unlawful Government conduct, including Fourth and Fifth Amendment violations. *United States v. Waide*, 60 F.4th 327, 338 (6th Cir. 2023). As discussed, Rowe is correct to the extent that his pre-*Miranda* statements made in custody must generally be suppressed. *See* Section III(C), *supra*. These statements were taken by law enforcement in direct violation of his rights. Otherwise, though, the uncontroverted body-worn camera evidence and testimony of Officer Church show that the police lawfully initiated the traffic stop based on Rowe's tinted windows, lawfully detained Rowe incidental to that stop, lawfully initiated a vehicle search of Rowe's car based on the smell of marijuana, and *Mirandized* Rowe before he admitted to possessing the Glock and the drugs. Although there was that period of time during which Rowe was in custody but un-*Mirandized*, his statements made at that time had no bearing on the physical evidence that the police obtained from his car, and thus have no bearing on his requested suppression of that evidence.[7] Those statements themselves are suppressed, but the majority of Rowe's statements are not, and no physical evidence obtained from the car was fruit of the poisonous tree. *Compare Blair*, 524 F.3d at 753. Rowe's statements could not have tainted evidence that was already discovered.

Last, to the extent that Rowe argues that the conduct of Officers Church and Felter was outrageous or egregious, he provides no basis for his conclusory arguments and concedes that his

---

[7] Even if they had, that would not necessarily implicate the fruit of the poisonous tree doctrine. *Miranda* protects against self-incrimination, which is not implicated by physical evidence resulting from voluntary statements. *Patane*, 542 U.S. at 634; *Burton*, 828 F. App'x at 292–93 ("[W]hether to admit physical evidence found because of an un-*Mirandized* statement is ultimately a question of voluntariness.").

18

argument is based on state case law and Supreme Court dicta.  Moreover, none of his cited cases actually found outrageous government conduct.  In fact, they do not appear to be factually analogous to this case in any way.  These arguments are waived as "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." *United States v. Layne*, 192 F.3d 556, 566–67 (6th Cir. 1999) (citation and internal quotation marks omitted).

## IV.  CONCLUSION

Crime calls for punishment.  However, in investigating crime, the Government is constrained by the safeguards that are the Fourth and Fifth Amendments.  The Fourth Amendment is not a hurdle for zealous law enforcement to overcome.  Police making traffic stops must not abuse their probable cause authority or "succumb to the temptation of allowing the end to justify the means," *United States v. Freeman*, 209 F.3d 464, 470–71 (6th Cir. 2000) (Clay, J., concurring); *see Warfield*, 727 F. App'x at 188, because  an unconstitutional "search is not made lawful by what it brings to light." *Byars v. United States*, 273 U.S. 28, 29 (1927).  In this case, the Government advances arguments about Rowe's behavior that seem flatly contradicted by video evidence and could provide an end-run around the Fourth Amendment.

Just as the Fourth Amendment is not an obstacle to good policing, the duty to inform a suspect of his Fifth Amendment rights is not simply a chore on a to-do list for police to cross off whenever convenient.  It is simply unacceptable that Officer Church took Rowe into custody, promised to warn him of his rights, and yet delayed doing so, continuing to question him all the while.  Police do not get to treat criminal suspects in custody like Tantalus, with promises of *Miranda* warnings held just beyond reach, while they attempt to lull the suspect into a truly false sense of security.  Rather, even "brief and cursory exchange[s]" require warnings. *United States v. Ray*, 690 F. App'x 366, 372 (6th Cir. 2017) (Marbley, J., by designation).  A suspect's Fifth

Amendment rights are sacred to due process, and Officer Church violated Rowe's rights by questioning him while he was handcuffed but had not yet been advised of his *Miranda* rights.  The Constitution does not tolerate shortcuts or end-runs around the rights it guarantees.

Rowe's Motion to Suppress (ECF No. 30) is **DENIED** insofar as it seeks to suppress evidence obtained from the search of Rowe's car, and it is **GRANTED** in part and **DENIED** in part insofar as it seeks to suppress Rowe's statements.  All statements made by Rowe after he was handcuffed but before he was read his *Miranda* rights are suppressed; all other statements are not suppressed.  Last, Rowe has been represented throughout the course of this case by appointed counsel.  His December 2025 *pro se* letter motion (ECF No. 27) requesting an evidentiary hearing and leave to file a motion to suppress is **DENIED** as moot.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  February 24, 2026**